UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

26-CV-1922

APPROXIMATELY 83,398.498681 USDT EQUIVALENT TO THE USDT ASSOCIATED WITH ADDRESS TBSfqRB3LQxsFq125hEnCUNtJvG3DfDonM ON THE TRON NETWORK,

Defendant *in rem*.

## VERIFIED COMPLAINT *IN REM*

The United States of America, by its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Elizabeth M. Palma, Assistant United States Attorney, of counsel, for its Verified Complaint herein alleges as follows:

## CAUSE OF ACTION

1. This is an action *in rem* pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C), for the forfeiture of the sum of approximately 83,398.498681 USDT, which is the equivalent to the USDT associated with address TBSfqRB3LQxsFq125hEnCUNtJvG3DfDonM ("Target Address") on the Tron Network, that was "burned" and reissued on or about April 7, 2026, by Tether Limited Inc. (the "Defendant Amount").

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction of this action commenced by the United States pursuant to Title 28, United States Code, Section 1345 and over an action for forfeiture pursuant to Title 28, United States Code, Section 1355(a).

3. This Court has *in rem* jurisdiction pursuant to Title 28, United States Code, Sections 1355(b) because acts or omissions giving rise to the forfeiture occurred in the Western District of New York.

4. Venue is properly premised in the Western District of New York pursuant to Title 28, United States Code, Section 1355(b), because the acts or omissions giving rise to forfeiture occurred in the Western District of New York.

## FACTUAL ALLEGATIONS

### USDT EQUIVALENT AMOUNT ASSOCIATED IN TARGET ADDRESS

5. On or about December 22, 2025, Tether Limited Inc. ("Tether") froze USDT tokens in the Target Address on the Tron Network.

6. On December 30, 2025, Magistrate Judge Jeremiah J. McCarthy issued a federal seizure warrant for any funds in the Target Address.

7. On or about April 7, 2026, Tether "burned" and reissued the USDT tokens associated with the Target Address, in the form of the Defendant Amount.

## RELEVANT STATUTORY AUTHORITIES

The following statutory provisions establish that the Defendant Amount is subject to forfeiture:

**Title 18, United States Code, Section 1343** provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined, imprisoned or both

**Title 18, United States Code, Section 1956(a)(1)** provides in relevant part, it is unlawful for a person to:

> . . . know[] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity [("SUA")]— . . .
>
> (B) knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity….

**Title 18, United States Code, Section 1956(h)** provides in relevant part, any person who conspires to commit any offense defined in this section 1956 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**Title 18, United States Code, Section 1956(c)(7)(A)** states in pertinent part that the term "specified unlawful activity" includes offenses listed in Title 18, United States Code, Section 1961(1)(B).

**Title 18, United States Code, Section 1961(1)(B)** lists Title 18, United States Code, Section 1343 (wire fraud), as an offense that constitutes "specified unlawful activity."

**Title 18, United States Code, Sections 981(a)(1)(A) and (C)** provides in relevant part, the following is subject to forfeiture:

> (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, . . . of this title, or any property traceable to such property; or . . .
>
> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of…any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense (also referred to as "SUA proceeds");

## BACKGROUND ON CRYPTOCURRENCY FRAUD SCHEMES

8. Cryptocurrency investment schemes, commonly referred to as "pig butchering," generally involve scammers tricking consumer victims to make purported investments in virtual currency[1] on fraudulent or non-existent investment platforms, typically

[1] Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies

alleged to be managed by a third-party, and providing fictitious returns to encourage additional investments. The scammer(s) typically initiate contact through text messages or social media platforms and eventually form a relationship with the victim to gain the victim's trust. Those relationships may be perceived by the victims as romantic, professional, or friendship-based. The scammers often create profiles using fictitious names, locations, images, and personas, allowing the scammers to cultivate perceived personal relationships with prospective victims. Once the scammer develops a rapport with the victim, they will often introduce the victim to cryptocurrency, and to fraudulent investment platforms through which the victim can invest. The scammers generally promise a lucrative return of investment if the victim invests, as the scammers allegedly have, in the fake third-party platform, and scammers manipulate the fraudulent investment platform to show an increase in the victim's account balance. The scammers typically also provide falsified transaction records or photos that depict the scammers contributing their own funds to the victim's initial investment. Often enticed by the falsified returns, victims continue to invest, until they try to retrieve their gains, only to find that they are unable to retrieve them. The scammers then demand that victims make additional payments to the platform for their investments to be released and/or withdrawn. Examples include, victims being required to pay an additional percentage to the fraudulent platform to purportedly guarantee the funds, prepay taxes on the balance, or pay a fee/fine due to suspicious money laundering activities. Eventually, scammers complete their theft once they believe they are unlikely to extract any more funds from the victim, and usually cease contact with the victim, never providing the return of their "invested" funds. Based

typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

upon the experience and training of the law enforcement officers involved, cryptocurrency investment scam compounds are predominantly based in Southeast Asia, however, they have recently expanded to other continents. Criminal organizations run these compounds and often use forced labor by means of human trafficked victims to target victims globally. [2]

9. Based on the experience and training of the law enforcement officers involved, the perpetrators of cryptocurrency investment schemes are highly effective in gaining an individual's trust and/or affection in a short amount of time using manipulative tactics and language. A single scheme is often facilitated by multiple individuals with different roles and responsibilities, including registrants, developers, and operators of these online platforms, that are prepared in advance to be used by scammers throughout the lifecycle of victim targeting. Criminal syndicates involved in these schemes commingle, consolidate, and coordinate their post-fraud money laundering activities of illicitly-obtained victim proceeds.

10. The 2023 FBI Internet Crime Report reported that in 2024, cryptocurrency fraud losses rose to $9.3 billion in 2024, a 66% increase. Within these numbers, cryptocurrency *investment* fraud rose to $5.8 billion in 2024, an increase of 47%."[3] Cryptocurrency investment scams are included in cryptocurrency scams and the losses reported.

---

[2] U.S. Treasury Dep't, Financial Crimes Enforcement Network, *FinCEN Alert* on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering," FIN-2023-Alert005, 1-2 (Sept. 8, 2023), https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.

[3] Federal Bureau of Investigation, *Internet Crime Report 2024*, 12, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

11. Based on the experience and training of the law enforcement officers involved, perpetrators of cryptocurrency investment schemes orchestrate fake investment gains to persuade victims that they are prudently investing their money. As part of the tactic, the victims are provided fictious earning statements to strengthen their trust in the platform's profit potential. Scammers will also utilize time-pressure to entice victims to invest large quantities of funds in a short period of time. Victims are also advised that they can retrieve their earnings off the platform. The short-term trade deadlines cause some victims to obtain additional funds by taking out personal loans, taking out second mortgages on their house, liquidating other investments, or borrowing money from family or friends.

12. The scam deposit virtual currency address,[4] are often used as a forward-facing address that the scammer will display on their investment platform. This type of address is often provided to the victim for their cryptocurrency investment deposits. Based on the experience and training of the law enforcement officers investigating these crimes, criminals use these addresses to induce victims to pay into scammer-controlled virtual currency wallets.[5] Once the funds are deposited into the scam address, they are stolen in a series of rapid transfers through and to addresses operated by the criminal syndicate. In many cases, including this one, victim funds are stolen and depleted from the scam address, and so called, "platform trades" never occur.

---

[4] A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

[5] A virtual currency wallet stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

## INVESTIGATION

13. This investigation was initiated following an in-person complaint on December 1, 2025, at the FBI Buffalo office, located at 1 FBI Plaza, Buffalo, New York.

14. The initial complaint was from Adult Victim (AV) alleging that he lost over $3.3 million via a romance/investment scheme.

15. On December 4, 2025, AV provided the following information to the FBI, Buffalo field office personnel:

a. AV was in communication with Unknown Subject (UNSUB).

b. UNSUB initiated contact with AV via Facebook, posing as attractive adult female.

c. After communicating for a brief time on Facebook, the UNSUB switched the manner of communication to WhatsApp.

d. This communication between AV and the UNSUB began in June of 2025.

e. AV and UNSUB conversed daily about their families, work, and hobbies.

f. AV and UNSUB communicated via text message on WhatsApp, as well as spoke on the phone and on video calls.

g. After communicating for several months, AV told UNSUB that he loved her, UNSUB told AV that she loved him too.

h. Beginning in approximately June of 2025, UNSUB told AV that she could help him invest in cryptocurrency to make money.

i. UNSUB directed AV to download CashApp and Coinbase and further directed AV to the website Cryptunex.ai.

j. Throughout September, October, and November, UNSUB assisted AV in making various cryptocurrency purchases via CashApp and/or Coinbase in the amounts of approximately $250,000 each, totaling about $1 million.

k. AV borrowed the money against his securities to fund the purchases.

l. UNSUB told AV that his cryptocurrency investments were within the aforementioned trading platform called Cryptunex.

m. When AV viewed the Cryptunex application, it appeared as though he was making returns on what he believed to be investments.

n. Specifically, AV saw his active balance totaling approximately $850,000 less some market loss and fees.

o. When AV attempted to withdraw his funds, he got an error message stating that there was a security hold on the withdrawal.

p. AV knew that this was sometimes common for cryptocurrency withdrawals, so did not think much of it at first.

q. After a few weeks AV still could not withdraw his funds.

r. AV tried to contact Cryptunex, but did not receive any reply from representatives at Cryptunex.

s. Eventually, AV contacted Coinbase, and they told him that there was no record of any funds being sent to another platform.

16. AV consensually provided the FBI with the content of the WhatsApp communications he maintained with UNSUB and FBI personnel observed the following in the contents of the WhatsApp communications with UNSUB:

a. On or about October 12, 2025, UNSUB demanded AV invest in what he believed to be a cryptocurrency transaction to, in essence, prove his love and trust for her.

b. AV agrees to conduct a transaction, and UNSUB subsequently provides AV with step-by-step instructions for the investment via screenshots, usually high lighting which button to press with a red circle.

c. At 3:45:44 PM (UTC-4), AV sent UNSUB a screenshot of what appears to be his Coinbase platform with the amount $249,990 available to purchase cryptocurrency.

d. UNSUB then directs AV to purchase the maximum possible amount of a cryptocurrency called Ethereum (ETH) with the balance of $249,900.

e. AV sends a screenshot of the pending purchase of 58.76323087 in ETH ($249,900) to UNSUB.

f. Upon receiving the screenshot, UNSUB replies with that same screenshot but highlighted the "buy now" button with a red circle.

g. Subsequently, UNSUB directs AV to download the "Base"[6] application from the Apple App Store.

h. Once AV has downloaded and connected the Base wallet to Coinbase, UNSUB directs AV to send a test transaction in the amount of $1,000.00 in ETH to the Base wallet.

i. UNSUB then sends a screenshot to AV of .242 ETH ($1,001.07), directing AV back to the home screen of that wallet by circling it in red.

j. UNSUB then directs AV to transfer $50,000 of ETH from Coinbase to the Base wallet, but before doing so UNSUB instructs AV to speak with a live agent from Coinbase to ensure there are no issues with the transaction.

k. AV converses with the agent in the Coinbase application to ensure there are no hold-ups with the transfers.

l. UNSUB then directs AV to make two $50,000 ETH transfers and one $100,000 in ETH, AV sends a screenshot confirming these transfers to the base wallet.

[6] Base is a self-custody wallet application on the Coinbase network, formally known as "Coinbase wallet."

m. AV sends a screenshot confirming these transfers to the Base wallet and shows the remaining balance of $41,789.70 (10.11480185 ETH), in the Coinbase wallet.

n. UNSUB then instructs AV to send $41,700 from Coinbase to the Base wallet.

o. UNSUB sends a screenshot directing AV to copy the wallet address "0xb17E2194cc78e86020ddDeD44f4C68A3b531c791".

p. UNSUB instructs AV to go back to Base wallet and paste in the wallet address that he previously copied and send a test transaction of $1,000 ETH, which AV confirms was sent.

q. UNSUB then directs AV to send his remaining balance of ETH to the same address.

r. AV sends the remaining balance of $242,073.23 (58.452 ETH) to this wallet and sends a screenshot to UNSUB confirming the transfer.

s. UNSUB then instructs AV to deposit 58.452 ETH into the Cryptunex application and sends a screenshot to AV.

t. AV sends a screenshot to UNSUB confirming the deposit was made.

17. Based upon information obtained through the investigation, Cryptunex is a fake website that appears to AV as a real application containing his cryptocurrency balance; however, the balance displayed is completely fictious.

## RELEVANT CRYPTOCURRENCY INFORMATION ADDRESSES

18. The following table identifies cryptocurrency addresses relevant and discussed throughout this Complaint:

| Referenced Name | Address | Network |
|---|---|---|
| Address A | 0xb17E2194cc78e86020ddDeD44f4C68A3b531c791 | Ethereum |
| Address B | 0xFEc5aBfC22042dde20C7B48F56A2A212dB70afdE | Ethereum |
| Address C | TE5cexGizXTzg1TUCD4s81PLTmdMMJhLD8 | Tron |
| Address D | TUYwvcKmyhJ2HC2cJmUc43YbTYfXVur9dU | Tron |
| Target Address | TBSfqRB3LQxsFq125hEnCUNtJvG3DfDonM | Tron |

19. As set forth in more details below, the funds the victim sent to UNSUB ("Victim Funds/SUA Proceeds") are traced through transactions associated with various addresses as follows:




**<u>TRACING OF THE VICTIM FUNDS/SUA PROCEEDS</u>**

20. Using commercial blockchain analytical tools as well as open-source block explorers,[7] FBI personnel traced Victim Funds/SUA Proceeds and observed that:

a. On October 12, 2025, at 22:49 UTC, Address A received a deposit of 58.6783863301448 ETH in Victim Funds/SUA Proceeds.

b. The balance of Ethereum (ETH) in Address A immediately prior to this deposit was 0.00102063825446959.

c. Approximately 5 minutes later, at 22:54 UTC, 58.4365396931434 ETH of Victim Funds/SUA Proceeds was sent from Address A to Address B.

[7] Open-source block explorers allow anyone with an internet connection to view transactions related to specific blockchain addresses. Some of the most popular block explorers are etherscan.io, tronscan, etc.




d. The balance of Ethereum (ETH) in Address B immediately prior to this deposit was 0.240778485 ETH.

e. The Victim Funds/SUA Proceeds commingled with the other funds already in Address B (together hereinafter "Address B Commingled Funds").

f. Approximately 15 and 30 minutes later, at 23:09 UTC and 23:26 UTC, 29.0886411 ETH of Address B Commingled Funds and 29.08532494 ETH of Address B Commingled Funds were respectively transferred from Address B to Bridgers.xyz, a decentralized exchange (DEX) cross-chain aggregator.[8]




g. Within approximately 10 minutes of receiving the transfer, at 23:19 UTC and 23:32 UTC, the DEX swapped the 29.0886411 ETH of Address B Commingled Funds and 29.08532494 ETH of Address B Commingled Funds from the Ethereum blockchain to the Tron blockchain in the amount of 117,591.1389 Tether Token (USDT) and 117,840.8475 USDT respectively and transferred those amounts into Address C (together "Exchanged Commingled Funds").




[8] Decentralized exchanges (DEX) provide swapping services to customers to connect to multiple blockchains. DEX aggregators utilize numerous DEXs to find the best price of an asset swap for their customers.

h. The balance of USDT in Address C prior to this transaction was 2,021.04703 USDT.

i. The Exchanged Commingled Funds commingled with the other funds already in Address C (hereinafter "Address C Commingled Funds").

j. Approximately 20 minutes after, at 23:53 UTC, 212,453.033403 USDT of the Address C Commingled Funds was transferred to Address D.




k. The balance of USDT in Address D prior to this transaction was 92,727.887295 USDT.

l. Address C Commingled Funds commingled with the balance of the other funds already in Address D (hereinafter "Address D Commingled Funds").

m. After October 12, 2025, there were no deposits of significance into Address D.

n. On November 12, 2025, at 15:35 UTC, 230,093.486919 USDT of the Address D Commingled Funds was transferred to the Target Address.




o. Since November 12, 2025, the Target Address has not had any other deposits of significance.

p. Between November 12, 2025 and December 17, 2025, multiple withdraws occurred from Target Wallet.

q. The balance of 83,398.498681 USDT that was burned from Target Address constituted Victim Funds/SUA Proceeds and property involved in laundering the Victim Funds/SUA Proceeds.

## CONCLUSION AND REQUEST FOR RELIEF

21. In summary of the facts above, Addresses A, B, C, D and Target Address, all bore suspicious characteristics present in other cryptocurrency investment schemes. First, perpetrators' fraudulently associated their platforms to reputable financial institutions or cryptocurrency exchanges ("Cryptunex"). Second, the subsequent transactions show commingling and rapid movement of Victim funds/SUA Proceeds. Third, all of the addresses were created or active recent to October 12, 2025, the day UNSUB 2 obtained the victim funds/SUA proceeds. Fourth, each address appears to only have been active for October 12, 2025, and are now dormant and depleted. Lastly, the perpetrator converted the victim funds/SUA proceeds from the Ether Tokens on the Ethereum Network to Tether Tokens on the Tron Network.

22. Based on all of the facts set forth in the above, the circumstances surrounding those facts, and the experience and training of the law enforcement officers involved, there is reasonable belief that the Defendant Amount constitutes: (A) property, real or personal, which constitutes or is derived from proceeds traceable to a violation of…any offense constituting "specified unlawful activity" (such as wire fraud) and is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C); and/or (B) property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 of this title, or any property traceable to such property and is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**WHEREFORE**, the United States of America respectfully requests that:

(1) an arrest warrant *in rem* be issued for the arrest of the Defendant Amount;

(2) all persons having any interest therein be cited to appear herein and show cause why the forfeiture should not be decreed;

(3) a judgment be entered declaring the Defendant Amount be condemned and forfeited to the United States of America for disposition in accordance with the law;

(4) the costs of this suit be paid to and recovered by the United States of America; and

(5) the Court grant such order and further relief as deemed just and proper.

Date: September 4, 2026
Buffalo, New York.

MICHAEL DIGIACOMO
United States Attorney
Western District of New York

By: */s/ Elizabeth M. Palma*
ELIZABETH M. PALMA
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5860
elizabeth.palma@usdoj.gov

STATE OF NEW YORK )
COUNTY OF ERIE ) ss.:
CITY OF BUFFALO )

I, JOSHUA SIBENIK, hereby verify and declare under penalty of perjury as provided by Title 28, United States Code, Section 1746 that:

I am a Special Agent with Federal Bureau of Investigation ("FBI").

I am familiar with the facts and circumstances surrounding the obtainment of approximately 83,398.498681 USDT on or about April 7, 2026, which is the equivalent to the USDT associated with address TBSfqRB3LQxsFq125hEnCUNtJvG3DfDonM on the Tron Network.

The facts alleged in the Verified Complaint *in rem* are true to the best of my knowledge and belief and based upon my personal knowledge and information furnished to me by law enforcement officers and intelligence analysts and provided to officials of the United States Department of Justice.

DATED: September 4, 2026
Buffalo, New York

*/s/ Joshua Sibenik*
JOSHUA SIBENIK
Special Agent
Federal Bureau of Investigation